THE PRESIDENT AND DIRECTORS OF THE UNION BANK OF MARYLAND *vs.* REVERDY JOHNSON AND JOHN GLENN. *December,* 1837.

On the 23d of March, 1834, E. P. conveyed to the plaintiffs all his estate, real, personal, and mixed, in *trust* to sell the same, and apply the proceeds to the indemnification of the plaintiffs and others, against certain responsibilities which they were under for him. This deed was duly acknowledged, on the day of its date, but not recorded until the 30th of June following.

On the 8th of May, 1834, the said E. P. in consideration of the said responsibilities, and of other debts due from him, executed another deed to the plaintiffs, conveying to them all his property and estate, rights, and credits; in trust to indemnify the plaintiffs and others, and for other purposes.

Certain agents of E. P. on the 24th March, 1834, remitted him by mail, a draft for $5,000, at 60 days, drawn on a mercantile house in New York, which was received by him in Baltimore on the 7th of April, following.

On the same day E. P. endorsed and delivered the draft to P. E. & Co. who deposited the same with the defendants for collection on the same day, in the usual course of business.

This draft was forwarded by the defendants to New York for collection, was paid there on the 11th of June, 1834, by the acceptors; the proceeds received by the defendants on the 14th of the same month, and on that day was passed to the credit of the depositors, P. E. & Co.

On the 2d of June, 1834, the plaintiffs apprised the defendants by letter, that they claimed the proceeds of this draft, under the before mentioned deeds, if it was received by E. P. subsequently to the 23d of March, or was in his possession on that day, and not discounted by others.

After the receipt of this letter, and after the receipt by the defendants of the money for the draft, to wit: on the 5th July, 1834, they, in conformity with the opinion of counsel, paid the same to P. E. & Co.

The plaintiffs offered evidence to show that P. E. & Co. were indebted to E. P. at the date of the deed of the 23d of March, 1834, and on the 7th of April following, when he endorsed the draft in question to them, and that they had knowledge of the execution of the deed.

It was in proof, that the plaintiffs up to the 7th of April, 1834, had paid no money, nor suffered any loss on account of their responsibilities for E. P. though after that date, they had collected and paid away various sums under the deeds.

Upon this state of facts, the plaintiffs instituted suit against the defendants on the 5th July, 1834, for the amount of the draft, and it was *held*, upon appeal, that they were entitled to recover.

APPEAL from *Baltimore* county court.

This was an action of *assumpsit*, brought by the appellees against the appellants on the 5th day of July, 1834, to re-

38    v.9

cover the sum of $5,000, had, and received by the appellants, to the use of the appellees. The defendants pleaded *non assumpsit*, on which issue was joined.

At the trial, the plaintiffs to support the issue on their part, offered in evidence to the jury, that the Bank of Maryland, whereof *Evan Poultney* was president, and principal owner, being in embarrassed circumstances, and compelled to stop payment, the said *Evan Poultney* on the 23d March, 1834, executed the following deed to the plaintiffs in this cause.

EVAN POULTNEY, *deed of trust to* JOHN GLENN *and* REVERDY JOHNSON.

This indenture, made this twenty-third day of March, in the year of our Lord one thousand eight hundred and thirty-four, between *Evan Poultney* of *Baltimore*, of the one part, and *John Glenn* and *Reverdy Johnson*, of the same city, of the other part, witnesseth, that whereas, the said *John Glenn*, and *Reverdy Johnson*, and *Hugh McElderry, David M. Perine*, and *Evan T. Ellicott*, are, and stand responsible to the *Union Bank of Maryland*, for and on account of the president and directors of the Bank of Maryland, and of *Evan Poultney* aforesaid, or of either of them, in certain sums of money, at the instance and for the benefit of said *Poultney;* and whereas, it is the wish and desire of the said *Poultney* to save harmless, and indemnify the said *John Glenn, Reverdy Johnson, Hugh McElderry, David M. Perine*, and *Evan T. Ellicott*, for and on account of said responsibility, and for that purpose executes these presents. Now this indenture witnesseth, that for and in consideration of the premises, and of the sum of five dollars, to the said party of the first part paid by the parties of the second part, he, said party of the first part, hath granted, bargained and conveyed, and by these presents doth hereby grant, bargain and convey, to the said parties of the second part, all his, the said party of the first part's, estate, real, personal, and mixed, of every kind and description whatsoever, wherever situated. To have and to hold the said estate, real, personal, and mixed, to them, the

said *John Glenn* and *Reverdy Johnson,* parties of the second part, their heirs and assigns forever, to and for their exclusive use and benefit. In trust, nevertheless, that they, the said *Glenn* and *Johnson,* their heirs, executors, and administrators, shall, at such time and times as they may deem it necessary, to and for the purposes of saving and indemnifying themselves, and the other parties aforesaid, sell and dispose of the said estate, real, personal, and mixed, and on such terms as they may deem proper, and at either public or private sale, and in further trust, that they apply the proceeds of the sale or sales of said property, as aforesaid to be made, to the payment and discharge of the responsibilities aforesaid, held by the said *Union Bank,* and for which they, the said *Glenn, Johnson, McElderry, Perine,* and *Evan T. Ellicott,* are liable as before mentioned. In testimony whereof, the said *Evan Poultney* hereto affixes his hand and seal, the day and year herein before written. EVAN POULTNEY. [Seal.]

Which said deed, it is admitted, was executed and acknowledged on the day of its date, but was not recorded until the 30th June following, and that on the 8th May following, the said *Evan Poultney* executed to the same parties, another deed in the following words and figures, to wit:

EVAN POULTNEY, *deed of trust*  
to  
REVERDY JOHNSON  
*and*  
JOHN GLENN.

This indenture, made this eighth day of May, in the year ·of our Lord one thousand eight hundred and thirty-four, between *Evan Poultney,* of the city of *Baltimore,* and state of *Maryland,* of the one part, and *Reverdy Johnson* and *John Glenn,* of the same city and state, of the other part : Whereas, the said *Evan Poultney* has heretofore obtained a loan at the *Union Bank of Maryland,* of fifty thousand dollars, on a certificate of special deposite issued by the Bank of Maryland, in his favour, and endorsed by him, and at his instance, and by his request, by the said *Reverdy Johnson, John Glenn,* and others, which loan was passed by him to the credit of said Bank of Maryland. And whereas, also, the said *Reverdy*

*Johnson, John Glenn,* and others, also loaned their three notes for ten thousand dollars each to said *Poultney,* upon which he also obtained at said *Union Bank of Maryland,* a loan for that amount, which was immediately passed to the credit of said Bank of Maryland. And whereas, at the time said *Reverdy Johnson, John Glenn,* and others, endorsed said certificate and loaned·said notes, it was in consideration that said *Evan Poultney* agreed to save harmless and indemnify them, from all loss or damage from·said endorsement and notes. And whereas, as a further protection to said parties, there was placed by said *Evan Poultney,* to their credit, in the Bank of Maryland, and which has ever since remained there undiminished, the sum of thirty thousand dollars. And whereas, also, the said *Reverdy Johnson, John Glenn,* and others, will be entitled, on payment of said certificate and notes to the *Union Bank of Maryland,* to be substituted to the rights of said latter bank, as a creditor of the Bank of Maryland; and of said *Evan Poultney,* and to all securities, collateral or otherwise, which the said *Union Bank* may hold or be entitled to, for and on account of the loans aforesaid. And whereas, the said *Evan Poultney* is also indebted to the General Insurance Company in an unsettled account, and is also indebted to the president and directors of the Bank of Maryland, or their trustees, *Thomas Ellicott, John B. Morris,* and *Richard W. Gill,* all of which he is desirous to secure. Now this indenture witnesseth, that for and in consideration of the premises, and of the sum of ten dollars, to him in hand paid by the said *Reverdy Johnson* and *John Glenn,* the receipt whereof is hereby acknowledged, he, the said *Evan Poultney,* hath given, granted, assigned, bargained and sold, and by these presents doth give, grant, assign, bargain and sell, to the said *Reverdy Johnson* and *John Glenn,* their heirs, assigns, all the property and estate, rights, and credits of him, the said *Evan Poultney,* hereinafter particularly mentioned, that is to say, one-eleventh interest in the real estate of the father of him, the said *Evan Poultney;* the lot or lots at the intersection of *Charles* and *Fayette* streets, on which are

erected a dwelling and warehouse; a house and lot on *Penn-sylvania Avenue* in the city of *Baltimore*; a tract of land in *Baltimore* county called "*Tunis*," with all and singular the improvements, and so forth, containing about six hundred acres—ground rents amounting to fifteen hundred dollars per annum; a tract of land called *Pickway Plains*, situate on the *Sciota* river, in the state of *Ohio*, containing one thousand acres; a house and lot in the village of *Bowling Green*, in the state of *Kentucky*; eight hundred and eighty-four shares of stock in *Baer's* Chemical works; one thousand shares of stock in the Commercial Bank of Millington; one hundred and fifty shares United States Insurance Company stock; five shares Baltimore and Wheeling Transportation Company stock; twenty shares in the Winchester Rail Road Company; sixty-eight shares Eastern Savings' Institution stock; forty shares Union Bank of Maryland stock; one hundred and sixty-seven shares Union Bank of Maryland stock, purchased of *George Carey*, hypothecated at the Savings' Bank for ten thousand five hundred dollars; fifty shares Life Insurance Company stock; nine hundred and fifty shares Bank of Maryland stock; my interest in the business of *L. L. Fowler & Co.; B. W. Hewson & J. B. Steinberger & Co.;* claim on *Maclay* and *Asher* amounting to twenty-three thousand three hundred and thirty-seven dollars and fifty cents, and also, all the other property and estate, rights, and credits of him, the same *Evan Poultney*, of every kind and description whatsoever, to which he may be in any way entitled, and wheresoever the same may be situated. To have and to hold all the aforesaid estate, real, personal, and mixed, rights and credits herein granted, conveyed and assigned, or intended to be hereby granted, conveyed and assigned to them, the said *Reverdy Johnson* and *John Glenn*, their heirs, executors, administrators, and assigns, forever; subject, nevertheless, to the several uses and trusts herein after stated, that is to say: in trust, in the first place, that they, the said *Reverdy Johnson* and *John Glenn*, their heirs, executors, administrators and assigns, shall, at such times and on such terms, as they may

think most advantageous to all the parties concerned, and either at public or private sale, sell or dispose of all, or any part of the estate and property hereby conveyed, and execute proper conveyances for the same, and also collect by suit or otherwise, all the aforesaid rights and credits, or compromise, or in any way arrange such portions thereof, whose collection may, in their discretion, be thought doubtful. In trust, in the second place, to hold and apply the proceeds arising from such sales, collections, or compromises, to save harmless and indemnify the said *Reverdy Johnson* and *John Glenn*, and others, from every kind of loss or damage, for, or on account of the before mentioned certificate of deposite, and three notes, amounting in the whole to eighty thousand dollars, endorsed and signed by the said *Reverdy Johnson, John Glenn,* and others, and discounted as herein before mentioned, and now held as aforesaid, by the *Union Bank of Maryland.* In trust, in the third place, to hold and apply the balance of the proceeds aforesaid, which may remain in their hands after the next preceding trust is gratified, to the payment and discharge equally and rateably, of all and every debt or debts which may be owing by said *Evan Poultney,* or for which he *is* in any way responsible. In trust, in the fourth place, to hold and apply the balance of said proceeds, which may still be remaining in their hands, to the payment and discharge, equally and rateably, of the balance of any debt or debts which may be due by the President and Directors of the Bank of Maryland, on any transaction of said bank, originating prior to the twenty-third day of March, eighteen hundred and thirty-four, after the assets then belonging to said bank, and conveyed by the president and directors thereof to *Thos. Ellicott, John B. Morris,* and *Richard W. Gill,* in trust, shall have been first applied to the discharge of the said debts. And lastly, in trust to pay over to the said *Evan Poultney,* his heirs, executors, administrators, and assigns, any balance of such proceeds that may remain in the hands of the said *Reverdy Johnson* and *John Glenn,* after each and every of the preceding trusts shall have been discharged. In testimony

whereof, the said *Evan Poultney* hath hereto set his hand and seal, the day and year first herein before written.

Evan Poultney. [Seal.]

Which said deed was duly executed, acknowledged, and deposited for record on the day of its date. And the plaintiffs further offered in evidence to the jury the following letter, which, it is admitted, was written by the parties signing their names thereto, dated Apalachicola, March 24th, 1834, and addressed to *Evan Poultney*, post-marked 29th March, at Columbus, in the state of Georgia:

"*Apalachicola, 24th March, 1834.*

" Evan Poultney, Esq. Baltimore.

" *Dear Sir*,—Your favour of 2d February, directed to us at Columbus, whence the writer has just returned, is before us. You instruct us to return the power of attorney—it has not been used—please find it enclosed herein. Enclosed also find our draft on *H. W. & S. Hill*, for five thousand dollars, at sixty days. When in Columbus the writer endeavoured to procure checks, but the cashiers of the banks were all absent on a visit to New Orleans. We now leave ten thousand dollars in United States notes, which we would remit you per mail, did your letter authorise us to do so, but we are not willing to take the risk. We had hoped that you would authorize us to pay over the funds to your agent here, or in New Orleans. All the Maryland notes which we have used here, were in bills on New Orleans, except three thousand dollars, which we paid out in our business—the bills do not mature until May, and one or two in June; hence our wish to hand over the exchange in New Orleans; however, we will endeavour to meet your views, and forward you funds as speedily as possible. The writer goes over in eight or ten days to New Orleans, and will, if possible, procure checks. If money matters are not too much deranged, we may be able to get the drafts running to maturity cashed; of this we can only conjecture. The specie that we brought over for Commercial Bank, was raised in New Orleans from our own friends, but predicated upon the remittances which we were to make on

bills with Maryland notes.    When the rupture took place we then bought bills with specie, which we remitted to New Orleans.    We have probably fifteen thousand dollars of your notes yet on hand, which we will use as occasion may offer for so doing safely—if we do not use it, will bring it on with us in May or June, as one of us expects to go north about that time.    Any amounts we may send on to you, please receipt to *Wm. Reynolds & Co.* for, and in the summer we will take up all the paper, and make a full and final settlement.

Respectfully, &c.    MACLAY & ASHER.

" P. S.—The writer will address you from New Orleans— we have written over there, ordering the drafts to be cashed if possible, as we are exceedingly anxious to close the transaction, and we suppose you want your money—in less than sixty days, sir, it shall be on the way."

Which letter, it is admitted, contained a draft drawn by *Maclay & Asher*, dated 24th March, 1834, for five thousand dollars, drawn on *H. W. & S. Hill*, of New York, in favour of *Evan Poultney*, and which letter and draft, it is also admitted, were duly received by *Evan Poultney*, in course of mail, on the 7th of April.    That the said draft was endorsed by *Evan Poultney* to *Poultney, Ellicott & Co.* and by the said *Poultney, Ellicott & Co.* deposited with the defendants for collection, in the usual course of business, on the 7th of April. That the said draft, on the same day, was sent by the defendants, as bankers, in the usual manner of collecting bills abroad, to the Merchants' Bank of New York, and the money thereon collected from the Messrs. *Hill*, the acceptors, on the day the said bill became due, to wit, on the 11th of June, and the proceeds received from the Merchants' Bank of New York by the defendants, on the 14th June, and, on that day, duly placed to the credit of the depositors of the said bill, to wit, Messrs. *Poultney, Ellicott & Co.* but withheld payment thereof until the 5th July, 1834.

And the plaintiffs further offered in evidence to the jury the following letter, addressed by them to the defendants, dated on the 2d June, 1834, which said letter, it is admitted,

was in the proper hand writing of the plaintiffs, and was received on the day of its date by the defendants :

" ROBERT MICKLE, Esq. *Cashier :*

" *Sir,*—I am informed by the acceptors, Messrs. *S. W. & H. Hill,* of New York, that you are the holders of a draft for $5,000, drawn by *Maclay & Asher,* of Apalachicola, in favour of *Evan Poultney,* of this place, and which is now in the Merchants' Bank of New York, sent there by your bank for collection. You are apprised, I believe, if not this will in-form you of it, that on the 23d March last Mr. *Poultney* executed to *John Glenn* and myself a deed of all his property, including the claim he then had against *Maclay & Asher,* and that early in the last month he executed another deed to us, both deeds intended for the benefit of his creditors.

" You will, therefore, please take notice, that Mr. *Glenn* and myself claim under those deeds, all property, rights, and credits of every description, belonging to Mr. *Poultney* on the 23d March last ; and, consequently, that if the draft referred to was received by him subsequent to that time, or was in his possession on that day and not discounted by others, it is our property ; and if such are the facts, which in a measure will appear by the draft itself, we shall claim the proceeds as soon as they are received by you.

Yours, respectfully,

REVERDY JOHNSON & JOHN GLENN,

By R. Johnson, *Trustees of E. Poultney.*
*Baltimore, 2d June, 1834.*"

And the plaintiffs further offered in evidence to the jury, that *William M. Ellicott,* one of the firm of *Poultney, Ellicott & Co.* on the 23d of March, 1834, that day being Sunday, called on *J. B. Latimer,* a justice of the peace, and asked him to attend at the house of *E. Poultney,* in order to take the acknowledgment of the deed of 23d March, and that the said *William Ellicott* went with said *Latimer,* and was present when the said deed was executed. And the plaintiffs further offered in evidence to the jury, in order to show knowledge

39      v.9

in the said *Poultney, Ellicott & Co.* of the execution and tenor of the said deed of the 23d of March, the following letter, addressed by them to a certain *B. W. Hewson,* of Cincinnati, which letter is dated on the 7th June, 1834, and is admitted to be in the hand writing of the said *Poultney, Ellicott & Co.* :

" *Banking House of P. E. & Co. Baltimore, June 7th,* 1834.

" B. W. Hewson,

" *Dear Sir*—Yours of the 2d is received ; the draft in favour of *S. L. Fowler & Bros.* has been presented, and we have requested them to hold it until we wrote to you on the subject. It appears by a conversation with the trustees of *Evan Poultney,* that they *propose* to hold us responsible for all entries and transactions in which he is concerned since the 23d March—such being the case, although we feel confident that they cannot succeed in it, do you not think it would be better for you to make provision for those drafts of *Amelung's* out of the materials you have in hand, either by transferring notes or bills for the purpose, or even by holding the claim on *Amelung* for the benefit of *S. L. Fowler & Co.* This you can do, not having been officially advised of any deed or conveyance which ought to prevent you ; whereas, if we were to make any payments on account of the concern, it is possible we might have to pay the same over again to the trustees, and have a suit to contend against in addition. *Fowler* can suffer no inconvenience in laying out of the money for a while, inasmuch as the money employed in that *concern* ( *S. L. Fowler & Co.*) was all furnished by *Evan*—at all events it would be better to wait a while, and see what is likely to turn up. You may rest assured, that we shall suffer nothing to go out of our hands that we can keep, and will do every thing we can to protect you in the matter in every way. The course pursued by the trustees, *Morris & Gill,* in relation to the stock, seems very extraordinary, and deserving of such notice as we shall endeavour to take of it when the proper time comes. It is certainly calculated to injure you as well as ourselves, but it is only another instance of the utter recklessness with which they have thought proper to act towards all those whom they choose

now to consider themselves authorized to attack. We do not know whether the stock is sold or not, having sent it to New York to be sold at certain limits, which we are not advised whether they have been obtained or not. If it is sold and is sent to Cincinnati to be transferred, we presume the cashier will not hesitate to transfer it; we should think he would be very unjustifiable in doing so upon the faith of any such letter as the one you refer to, and would perhaps render himself liable for damages both to you and us. There is a scheme a-foot, by which the creditors of the Bank of Maryland intend to endeavour to put their affairs in a way to get rather more for them than they seem likely to do under the administration of Messrs. *Morris* and *Gill.* We send you the ' Republican' of this morning, containing the proceedings of the first meeting, also a copy of a circular addressed to the principal creditors. It is to be hoped that matters will, before long, be somehow got into a way which will be more satisfactory. We will write you again in a day or two.

Respectfully,          POULTNEY, ELLICOTT."

And the plaintiffs further, to support the issue on their part, gave in evidence to the jury, from the books of *Poultney, Ellicott & Co.,* the following entries, contained in the leger in *Evan Poultney's* account :

" EVAN POULTNEY—page 604.

| | | |
|---|---|---:|
| March 31. | F. Schelles' note, . . . . | $50 50 |
| April 2. | ch. . . . . . | 800 00 |
| " " | " . . . . . | 4,161 86 |
| " " | " . . . . . | 5,000 00 |
| " 4. | Paid S. Poultney, trustee, . | 12,676 45 |
| " 9. | Bal. E. P. Bank, . . . | 16,972 99 |
| " " | Bal. from Mountenay farm, . . | 3,145 42 |
| " 10. | N. Williams' note paid in Bank Md. | 2,000 00 |
| " 22. | ch. . . . . . | 204 51 |
| May 6. | ch. . . . . . | 5,610 00 |
| " " | ch. . . . . . | 476 85 |
| " 23. | ch. . . . . . | 1,561 16 |

Union Bank of Maryland *vs.* Johnson and Glenn.—1837.

| | | | |
|---|---|---|---:|
| June | 21. | 35 shares Bank of Maryland stock, . | 17,500 00 |
| " | " | "                 " . . | 2,950 00 |
| " | 25. | Sundries, . . . . . | 35 48 |
| Aug. | 14. | ch. . . . . . . | 15 00 |
| Sept. | 3. | " . . . . . . . | 25 00 |
| " | 4. | bill, . . . . . . | 5 00 |
| Oct. | 10. | ch. . . . . . . | 20 00 |
| Dec. | 8. | Loss on Farmers' and Merchants' Bank | |
| | | Stock, . . . . . | 3,500 00 |
| " | 22. | Interest on his account, . . . | 12,438 30 |
| 1835. | | | |
| Feb. | 23. | do.       do. . . . | 121 33 |
| March | 4. | Paid Bank of Maryland on account | |
| | | of B. W. Hewson, . . . | 895 51 |
| " | 26. | Sundries, . . . . . | 585 81 |
| " | " | To sundry accounts as per journal | |
| | | entry in check-book P. . . | 238 74 |
| | | To transferred to new account, . | 188 93 |
| 1834. | | | |
| March | 31. | . . . . . . . | 100 00 |
| " | " | Bal. of Bank of Baltimore Stock, . | 176 00 |
| April | 2. | Cash, . . . . . | 4,213 03 |
| " | 5. | Ch. . . . . . . | 15,000 00 |
| " | 9. | " . . . . . . | 7,000 00 |
| May | 6. | " . . . . . . | 2,000 00 |
| " | " | " . . . . . . | 3,000 00 |
| " | " | 1447, . . . . . . | 4,969 17 |
| " | 8. | Cash, . . . . . | 6,965 32 |
| July | 5. | " . . . . . . | 9,226 95 |
| Dec. | 12. | Balance of B. W. Hewson's account, | 4,591 94 |
| " | " | Balance of S. L. Fowler & Co's acct. | 2,933 09 |
| " | " | Balance of B. Poultney's account, . | 843 17 |
| " | 22. | Part of certificate 1046 and interest, | 6,200 00 |
| " | " | Bal. Mountaney Farm and interest, . | 3,278 03 |
| 1835. | | | |
| March | 26. | By sundry accounts as per journal | |
| | | entry, in check-book P. . . . | 9,517 05 |

March 26. Balance of Bank Note account journal,

|  |  |  |
|---|---|---|
| | Ch. Bk. P. | 85 00 |
| " " Bills payable, | | 400 00 |
| " " Transferred to new account, | | 4,970 24 |
| " " Sundries as per journal Ch. Bk. P. | | 188 93." |

Also, by the entries from the general leger of the said *Poultney, Ellicott & Co.* containing the account of special deposites due by that house on the 22d of March, 1834, when the Bank of Maryland stopped payment; that on that day said *Evan Poultney* had, to his individual credit, on special deposite with that house, $170,000, and as trustee $138,144 95, and that said account did not show who were the *cestui que trust* of said last deposite. And here the plaintiffs rested their case.

The defendants, to support the issue on their part, offered in evidence to the jury, after the plaintiffs had given all the above evidence, as herein before set forth, a letter dated June 30th, 1834, from the defendants to the plaintiffs, which letter it is admitted was duly received by the said plaintiffs, and is admitted by them as legal and competent evidence in this cause, which letter, it is admitted, contained a copy of the resolution of the bank of the 30th June, hereinafter set forth, as a part of the proceedings of the bank. And also offered in evidence the following extract from the minutes of the defendants, which, it is agreed, shall be received in evidence in the cause, which minutes contain the proceedings of the board of directors on the 30th June, the 3d and 5th of July, 1834, and shew that they consulted counsel as to their liability under the communication made by the plaintiffs to them on the 2d June, and that the said sum of $5,000 collected on the draft (the discount being deducted) was actually, and in fact, paid over to the said *Poultney, Ellicott & Co.* on the 5th July, in pursuance of the opinion of counsel :

" *Extracts from the minutes of the Union Bank of Maryland.*

" 1834, June 30. On motion, resolved, that the cashier be directed to ask from said parties (Messrs. *Johnson* and *Glenn*) the deeds of trust under which they make the claim

set up in the said letter (letter of June 2d) on or before Thursday next."

" 1834, 3d July.   Ordered, that this board request the opinion of *George Winchester*, Esq. as to the right of the bank to hold the sum of five thousand dollars, collected for account of *Poultney, Ellicott & Co.* and claimed by *Reverdy Johnson* and *John Glenn,* by their letter of 2d June last, and that the board meet on the morning of the 5th instant, at eight o'clock, to receive the said opinion."

" 1834, July 5th.   The president laid before the board the following opinion, obtained in pursuance of the minute of the 3d of July, 1834, viz.

" My opinion is. asked by the *Union Bank of Maryland* upon the following statement of facts.   *Poultney, Ellicott & Co.* private bankers in the city of *Baltimore*, on the 7th of April last, deposited with the *Union Bank of Maryland,* for collection, on account of said *P. E. & Co. Maclay & Asher's* draft on *H. W. & S. Hill*, of *New York*, for $5,000, the draft was forwarded in the usual way, became due on the 11th of June, and was duly paid.   In the meantime, viz : on the 2d June, the *Union Bank* were informed by Messrs. *Johnson* and *Glenn,* that they claimed this draft as part of the property of *Evan Poultney*, who had transferred all his estate to them as trustees, by two deeds, one dated 23d March last, and the other on the 8th of May last.   Upon examination it appeared, that no deed of the 23d March could be found on record ; the deed of the 8th of May was executed and recorded on the day of its date.   The deed of the 23d March, has since, viz : on the 30th June, been put on record."   The question upon this statement is, has the bank a right to hold the money thus collected, and refuse to pay it over to *Poultney, Ellicott & Co.* on their order ?   I think not, and that in justice it cannot be properly withheld from them.   As a general principle, which is essential to the regulation of banking and commercial operations, the *Union Bank* could know no one in this transaction but *Poultney, Ellicott & Co.* from whom the draft was received, and to whom alone the bank was accountable.

Such is the universal practice, and this, like all other cases, must be governed by it. Or, a contrary principle, if adopted, must be equally general in its operation, and thus establish an inquisition into the private concerns of all persons who had dealings with the bank. The bank cannot recognize any other person as having an interest in a bill or note, but he who appears as the holder of it; any other course would involve them in interminable litigation. Courts of justice are the proper tribunals for the decision of all such questions. But even if the bank were at liberty to exercise a discretion in the matter (which I do not think they are) it would not alter the case. It appears that the bill was deposited for collection by *P. E. & Co.* on the 7th of April, 1834, and that the deed of trust (which was duly executed and recorded) was made on the 8th May following, a month after. Now the title of *P. E. & Co.* under the legal operation of this deed, could not be affected to the bill itself, in their hands as endorsers, or will the bank undertake to step over these facts, and institute an inquiry, as to how and when, and from whom, and upon what consideration, *P. E. & Co.* received this bill, and to determine to retain the funds to meet what, in their view, may be the proper mode of distribution. According to the deed, the trustees have clearly no right to the bill, as it was passed away before the deed was made in the ordinary course of commercial operations. Whatever the claim of the trustees may be, is a matter between them and *Poultney, Ellicott & Co.* to be decided in the ordinary way, and before the proper tribunals, and no where else. The production of the private deed of the 23d March, and putting it in record long after the bill was paid, and the funds in the hands of the *Union Bank*, as agents of *Poultney, Ellicott & Co.* does not alter the case; why this deed has been kept back, and why it is now produced, will, no doubt, be a subject of investigation elsewhere; certainly the bank have nothing to do with it. Can the bank undertake to say how far it is valid; whether it was not revoked by the subsequent deed, and so understood by all the parties, or in one word, how can they

undertake to decide any question about it? The state of the case is simply this—the bank finds itself in the possession of the proceeds of a bill collected for one of its customers, in the ordinary course of business, who requires it to be paid over to him; another person interposes a claim and says, I am entitled to it under a deed made to me at such a time, and here it is—it turns out to be a month after this bill was transferred to the present holder—but, says the claimant, here is another deed of an earlier date, which it did not suit me to make use of, but which I bring forward now, as showing me to be entitled to it, and I pray you to hold this money until the validity and effect of this deed shall be established by law. Under such circumstances there would seem to be no difficulty as to the course of the bank. There is another view of this subject, which shows that the bank ought not to interpose to arrest these funds, to the injury of their acknowledged principal in the business. It appears by *Mr. Johnson's* letter, dated 2d June, that he had corresponded with the acceptors of the bill in *New York*, and knew at what bank the bill was placed for collection, it was in the power of the trustees then (if they had a legal or equitable right) to have instituted legal proceedings in *New York*, and have arrested the funds from passing into the hands of *Poultney, Ellicott & Co.* and thus have placed the controversy where it ought to stand, between the trustees of *E. Poultney*, and *Poultney, Ellicott & Co.*— having failed to avail of this remedy, the natural, and proper, and legal one, is it to be expected that the bank will consent to interpose itself between the litigants, after the money has been collected and is virtually in the hands of *P. E. & Co.* I would again remark, that the clear remedy of the trustees is against *Poultney, Ellicott & Co.* who are responsible for whatever claim may exist against them, in the courts of law or equity. · GEORGE WINCHESTER, *4th July*, 1834."

When, on motion, it was resolved, that the cashier be directed to pay to *Poultney, Ellicott & Co.* the sum of $5,000, mentioned in the said minute of the 3d inst."

And the plaintiffs, on their part, offered in evidence to the

jury, that in reply to the letter herein before set forth and described, as addressed to them by the defendants, dated 30th June, as aforesaid, they sent to the defendants a copy of the deeds of the 23d March, and 8th May, 1834. And the plaintiffs further offered in evidence, from a book of *Poultney, Ellicott & Co.* entitled " Personal Account Ledger," as herein before inserted. (It is understood that the defendants reserve to themselves all legal objections to the testimony herein above set forth in this statement of facts, so far as the same is offered to prove that *Poultney, Ellicott & Co.* or *Thomas Ellicott,* had knowledge of the deed of the 23d March, 1834.) It is admitted by the plaintiffs, that up to the 7th of April, 1834, and for some time afterwards, they were not obliged to pay, nor had they paid any moneys, or suffered any loss, on account of the said *Evan Poultney,* against which the said deed was intended to indemnify them; but that the said plaintiffs have, from time to time, since the 7th of April, collected and paid over various sums of money, received from divers persons, under and by virtue of said deeds of 23d of March, and 8th May, 1834, all of which was paid to the defendants, under and in pursuance of the said deed, and was known by defendants to have been received by plaintiffs under said deeds of 23d of March, and 8th May, 1834. It is also admitted, that no measures were taken at law or otherwise, except such as is herein before set forth by the plaintiffs, to arrest or suspend the negotiation of the draft for $5,000, nor that the same was ever delivered to them, nor its delivery demanded by them from any of the parties into whose hands it had passed. It is further admitted that they were under liabilities for the said *Evan Poultney* to the defendants, as security for him, at the date of the said deed of 23d March, to the amount of $80,000, and these are the only liabilities of said plaintiffs for said *Poultney.* Whereupon, the defendants, by their counsel, prayed the court, upon all the evidence above set forth, to instruct the jury, that if they believe the evidence in the cause as above set forth, the plaintiffs are not entitled to recover in this action.

1. Because the deed of 23d March, 1834, from *Evan Poultney* to the plaintiffs, not having been recorded until the 30th June following, did not pass a title in the bill in question to the said plaintiffs, which was valid and operative in law against the title acquired by *Poultney, Ellicott & Co.* under the endorsement and delivery to them from *Evan Poultney.*

2. Because no title to the bill passed by the said deed to the said plaintiffs, the said bill never having been delivered to the said plaintiffs, either at the date of the deed or afterwards, and the said plaintiffs never having forbidden the negotiation of the said bill, by notice or otherwise, and the said bill being, in fact, negotiated by the said *Evan Poultney,* by endorsement to *Poultney, Ellicott & Co.* and by *Poultney, Ellicott & Co.* deposited with the defendants for collection.

3. Because the items of the deed do not comprehend or include *choses in action,* or bills, or promissory notes, and therefore conveyed no title to the bill in question to the said plaintiffs.

4. Because the deed of 23d March, being intended to save harmless and indemnify the grantees against liability, and to secure them for any payments they might be obliged to make on account of *E. P.* and the said *Johnson* and *Glenn* having neither taken possession of the draft in question, nor forbid its negotiation, nor resorted to any measures at law or otherwise, to obtain possession of the draft, or to arrest or suspend its negotiation, and the said *Johnson* and *Glenn* not having been obliged, up to the 7th of April, to pay any money for the said *Evan Poultney,* nor in other way having incurred loss against which the deed was intended to secure them, by reason of all which, the said plaintiffs acquired no title under the deed sufficient to invalidate the right of the defendants, to pay over the proceeds of the draft to the said *Poultney, Ellicott & Co.*

5. Because, although the said deed may have conveyed the interest of the said *Evan Poultney,* in the said draft, to

the said plaintiffs, yet the said draft having been assigned, by endorsement and delivery, to the said *Poultney, Ellicott & Co.* and by them deposited with the defendants for collection, and by them collected and paid over to the said *Poultney, Ellicott & Co.* the defendants were bound to account for the proceeds of the said draft, and justified in paying over the same to the persons from whom they had received it.

6. Because that the said deed of the 23d March, although it may have conveyed the interest of *Evan Poultney* in said draft to the said plaintiffs, yet the same not having been placed on record, or notice thereof given to the said defendants, when the said draft was deposited for collection in the *Union Bank,* and when the liabilities of said defendants, as agents in the collection of said draft, commenced to the said *Poultney, Ellicott & Co.* the subsequent notice given by the said plaintiffs to said defendants on the 2d June, could not alter or modify the obligation already existing on the part of said defendants, to account for and pay over to the said *Poultney, Ellicott & Co.* the proceeds of said draft when collected.

Which instructions the court refused to give—the defendants excepted.

The jury found a verdict for the plaintiffs for $5,000, and the defendants appealed to this court.

The cause was argued before Buchanan, Ch. J. Stephen, Dorsey, and Chambers, Judges.

Latrobe, for the appellant :

There are but two main questions. 1. Is to ascertain the relations which subsisted between *Poultney, Ellicott & Co.* and the *Union Bank,* on the 7th April, 1834. What the obligation of the bank resulting from them ? And 2. Was that relation modified or released by the notice of the plaintiffs below ?

The relation in the first case, was that of principal and agent. The obligations on the bank arose from its character as agent. What then is the effect of notice by a third party

Union Bank of Maryland *vs.* Johnson and Glenn.—1837.

to an agent? How far are third parties empowered to release the bank from the obligation to pay *Poultney, Ellicott & Co.* ? The agent cannot be liable to two principals; therefore if the notice made the bank liable to the plaintiffs, it must also release the bank from liability to *Poultney, Ellicott & Co.* Nor can there be a better test than whether the defendants are still liable to that firm. If responsible to them, they are not responsible to the plaintiffs. It is unnecessary to review the law of principal and agent. *Paley on Agen.* 289, lays down the rule, that where an agent names his principal, the principal and not the agent is the responsible person to *third* parties. *Paley on Evid.* 304. An agent receives money from his principal, and which may be recovered from the principal. As long as the agent has the money, the creditor has an election. But this is when the party paying the money seeks to recover it back. It does not apply to a *third* party. *Butler and Harrison, Cowper.* 3 *Maul. and Sel.* 344.

Again: An agent is liable to a *third* party where he receives money specifically appropriated to a *third* party. There if he is expressly bound, he becomes liable to pay such third party. 14 *East.* 582. 3 *Price,* 58. 3 *B. and Ald.* 664.

An agent is only liable when there is privity either between the third party and the agent, or his principal. It is not pretended here, that the *Union Bank* received the money from the plaintiffs, nor any specific appropriation of the fund.

The plaintiffs contend that the draft in question was their property, and that a liability results from paying their money to *Poultney, Ellicott & Co.*

This involves two questions: 1. Can the plaintiff try title in an action against the agent, the bank? 2. Did the deeds show they had title?

That this title of plaintiffs cannot be tried in an action against these defendants, and that the agent cannot be converted into an implied trustee. See 5 *Mad. C. R.* 36. 9 *Price,* 269. 4 *Eng. Ex. Rep.* 89. 2 *Bar. and Ald.* 310. 7 *Bing.* 339. 2 *Hall. N. J.* 1. 9 *Bing.* 312. 23 *Serg. and Low.* 312.

The present case is distinguishable from that in 9 *Bing.* on the ground of fraud.

If the plaintiff intended to rely on fraud, the notice was not sufficient. The notice relies on the deeds only ; the first deed was not recorded, and was not evidence to the bank. It was not known to *Poultney, Ellicott & Co.* so as to make their conduct fraudulent; nor is there any proof of fraud on this record. The second deed was a substitute for the first. That deed did not convey the draft; it only conveyed $23,000 of *Maclay & Asher's* debt, while they on the 24th March still owed him $28,000.

If competent to make the bank an implied trustee, the plaintiffs exhibit no such title as will make the bank liable. What sort of notice is sufficient to effect this object ? From whom may it come ? Its effect upon the character and means of merchants and bankers would be ruinous. The rule is liable to great abuse. The stoppage of funds in the hands of a bank by mere notice, would be highly prejudicial, and the general rule, which requires privity of contract, is salutary.

Notice of all facts in possession of the claimant should be given, and it should state the facts necessary to make out the title on which reliance is placed. Here the facts of the title are displayed. It depends on the deeds alone, but no more. 7 *Bing.* 20 *Serg. and Low.* 426. *Buller N. P.* 133.

The action of a third party against an agent or collector, cannot be sustained if he can show the least colour of right in his principal; and here the bill of exchange was transferred at law.

R. JOHNSON, for the appellees :

The responsibilities of the appellees for the debts of the Bank of Maryland, were all in the hands of the *Union Bank of Maryland.* The record does not state the time of the failure of the Bank of Maryland, nor when the former dynasty of the *Union Bank of Maryland* terminated, nor show the prompter of the payment to *Poultney, Ellicott & Co.;* but the deed of March, 1834, was executed in the presence of *William M.*

*Ellicott,* one of the firm of *Poultney, Ellicott & Co.* That deed was one of indemnity. The deed of May was not a substitute for the deed of March; it contains other stipulations; it gave security to the creditors of the Bank of Maryland generally. The ground of the second deed is greater than the first; the objects of the two were not the same. The latter called for more property, but did not abandon any thing which the first conveyed. It was no extinguishment of the deed of March.

The evidence shows that on the 23d March, 1834, besides $80,000 in hand, due *Evan Poultney,* they, *Poultney, Ellicott & Co.* owed *E. Poultney* $170,000. This appears by their books, in all $250,000 due him, *Evan Poultney,* individually. And also, upon special deposite, in trust for some undisclosed principal, $138,000—making in all, nearly $400,000. The effect then, of the deed of March, known to *P. E. & Co.* was to convey all the funds in their hands, belonging to *Evan Poultney.* It was not confined to *Maclay* and *Asher's* debt.

The open account shows payments to *Evan Poultney,* or on his account, the whole sum of $80,000. And there is a piece of evidence, the letter of the 7th June, 1834, addressed to *B. W. Hewson,* pregnant with fraud. This letter was read at the trial without objection—read to show *P. E. & Co's* knowledge of the deeds of March and May, 1834, and that under the deed of March, the appellees, as trustees of *Evan Poultney,* claimed this property, and honestly suggested to *Hewson,* that as he was not officially advised of the deed, he might hold on to the property, though *Poultney, Ellicott & Co.* could not. Their notions of fraud being notified of the deed forbidding it. *Maclay* and *Asher,* from *Apalachicola,* 1,000 miles off, mailed the draft for *Evan Poultney* on the 29th March. It reached him on the 7th April, 1834. On that day he endorsed it, delivered it to *Poultney, Ellicott & Co.* and they deposited it in the *Union Bank* for collection. On that day *Poultney* was a large creditor of that concern, and no evidence to show that *P. E. & Co.* had paid one dol-

lar of consideration for this draft of $5,000. The draft was remitted by the *Union Bank* to *New York* for collection. The appellees hearing of this draft, inform Messrs. *Hills*, the acceptors of their property in it, and they notify the *Union Bank* not to pay—the draft *not* then being collected. The *Union Bank*, then not creditors of *P. E. & Co.* and the notice informed them that the claim was made under their deeds. The money was received on the 14th June, 1834, and the bill paid some twelve days after notice. From the 14th June until the 30th, 16 days, the bank rested on the notice, and then the deeds of trust are asked for. Being produced on the 3d July, the opinion of *Mr. Winchester* is asked for, and a special board of directors was called at 8 o'clock on the 5th July, which sanctioned the payment of the money we now claim—and we are told we have no right.

As a general rule between principal and agent, the *jus tertii* cannot be tried. The counsel is in error in supposing the *jus tertii* cannot be tried for want of privity of contract. The case in 23 *Serg. and Low.* 312, if the want of privity is the ground of the doctrine, cannot be sustained. In that case there was neither contract nor privity.

The case of 20 *Serg. and Low.* 153, certainly decides that the character of principal and agent, as a universal proposition, does not exclude from the agent the right of setting up the true owner, or prevent the true owner from recovering from the agent.

There is no rule of policy which throws the true owner on the principal, and forbids his proceeding against the agent himself. If he recovers against the agent, it is the judgment which is the protection of the agent against the principal.

As respects the agent, he is just as much protected in deciding the title between him and the true owner, as between him and his principal.

The case then, in effect, decides that the agent can only protect himself against the true owner, by setting up a better title in his principal.

The action of ejectment furnishes an analogy. Why should

circuity of action be sustained? The true owner must have his remedy against somebody. The argument on the other side concedes we could recover from *Poultney, Ellicott & Co.* upon the deeds. The objection is not a want of title in the plaintiffs, but a want of title as against the agents of *P. E. & Co.*

If the rule applies at all, it applies to an agent who does not pay over. The plaintiffs then would be bound to wait until the principal recovered from his agent. This is delayed and increased litigation.

All the cases relied on, are cited in *Hademan vs. Wilcox,* 23 *Serg. and Low.* 312. That case is a decisive authority here. It proceeds on the ground that the plaintiff and an insolvent by collusion, put goods into the hands of the plaintiff's agent, and yet the agent set up the title of the insolvent's assignees as a defence.

In this case there is abundant evidence of collusion, and the proof is left without explanation, which authorized the rejection of the defendants' prayers below.

Upon their doctrine the fraudulent collusion might be found, and this court is asked, despite of that, to say the plaintiff cannot recover here, because of no privity between plaintiff and defendant.

The counsel attempts to distinguish this case, on the ground that in the decision in 23 *Serg. and Low.* the agent was informed of the fraud, and here the agent was only notified by implication. He thinks that notice of fraud is essential to maintain the action against the agent, and that on such a notice, and proof of fraud, the recovery may be had. They say we can recover from the *New York Bank,* or from the acceptor. The one being agent, and the other having only contracted with the legal owner of the draft. This in truth, is a surrender of the case.

The notice is no part of the cause ; it is a caution to the agent, who, if he pays without notice, is justified ; but if he pays after notice, he is liable if the fund belongs not to his principal. A suit against the agent operates as notice.

Independent of all notice, so long as the fund remains with the agent, the true owner may sue at once. The suit is no allegation of fraud, nor notice of fraud. Fraud, in fact, sustains the action. The whole object of notice is to protect the agent from an innocent payment to his principal. The want of privity is not sufficient to defeat the true owner. Either the proceeds of the draft, or the draft, may be recovered. If fraudulent collusion does not divest the plaintiff below, who can doubt but that *trover* would have lain for the draft.

Then the nature of the notice given to the bank, and the deeds of *Poultney* laid before it. The bank knew of his endorsement; the dates of the transaction. They knew the draft not endorsed prior to 23d March, and when he endorsed it, that he parted with funds *not* his own. They knew the transfer was a fraud on the deed.

The opinion in 23 *Serg. and Low.* places the right on the fraud in fact, and not on the notice.

If *Poultney* had himself given the draft to the defendants, there could be no doubt about the action ; and the intervention of *Poultney, Ellicott & Co.* can make no difference. They claim by a fraudulent collusion with *Evan Poultney*, which cannot fortify their right.

The prayers here were erroneous, because they took the case from the jury—fraud or no fraud. They were intended to take from the jury the very ground on which the right to recover existed, and on which the jury found.

Then as to the operation of the deeds, the recitals of the deed of 24th March gave notice to three parties. It was valid as respects *Poultney*. When he received the draft in April, he knew he was receiving what he had no title to. The deed passed all he had. On the 11th June, when the fund was received by the bank, it was known the plaintiffs were entitled to it ; they were the equitable owners of the sum—the proceeds of the draft. The moment the *Union Bank* received this fund it belonged to the plaintiffs, was for their use, and they can recover in this action. The act of 1829, ch. 151, would enable them to sue in their own names.

J. P. KENNEDY, in reply :

It is difficult to imagine a more perplexing position than that of our banking institutions generally, if the counsel for the appellees is correct.    An institution daily concerned with the collection of paper belonging to numerous parties ; a business requiring despatch and promptitude in its administration; that such a body should be liable to be placed in an attitude of litigation, called on to exercise her judgment between conflicting parties, and incur penal responsibilities for errors of decision, is an evil greatly calculated to diminish its utility.    If a bank charged with the collection of negotiable paper is in the predicament supposed, it equally concerns both its customers and the community.    If the credit, standing, and fortune of a trader is to be questioned upon a mere notice, he would often be forced to suspend payment, and await the determination of the question of right, shadowed forth by any claimant, and at the same time the bank refusing to pay, would be liable to damages to one party or the other.

What rule of conduct shall the courts establish for the government of agents ?    Can notice from any person suspend the payment of your notes ?    Must the notice establish title ?    Who is to be the judge of the title ?    Is the opinion of the astute to prevail ?    But this rule is not admitted.

It is said the notice is compulsory on the bank, to hold the fund at the high peril of all the consequences before stated.    The amount is immaterial.    If an agent submits to such a demand, he is responsible in damages.

In all cases, the agent ought to turn the party over to his principal, and be discharged.    This ought to be his course of business.    The other party may proceed by attachment or by injunction.    To intercept the fund, he should be forced to resort to his legal or equitable remedies ; adopt compulsory remedies as to the agent.    This should be the general rule as to commercial agencies, that he may acquit himself by paying over, and so transfer the controversy.

The exceptions to the general rule are founded on fraud ; the knowledge of that fraud should be carried home to the

agent, that he may determine how far his case is within the exception. Being satisfied of fraud, he ought to hold up the property.

Then, do the facts show any fraud between these parties, known to the agent?

At the time of the execution of the deeds, there was no design of fraud.

The court must determine on some grounds, that the agent is authorized to hold up the fund, or pay it over. No subject is more difficult to handle, and none more delicate, than the establishment of rules applicable to such subjects.

As to the facts; information of the failure of the bank was received on the 23d March. Various parties were bound by heavy liabilities for her. The deed was drawn up rapidly by the grantor, to secure them from responsibility. The 23d was Sunday; the character of the transaction is legible on the face of it; there is no reference to payments, nor any enumeration of the property conveyed—a broad conveyance of all the grantee had to cover all his debts. That done, the parties were secured and free from attachments. On the 8th May a deed was prepared more at leisure; a new deed was executed. The first deed was not recorded; the second deed was prepared and executed. No reason now existed for recording the first deed, which could give no vitality to the subsequent deed. In the letter of the 29th March, a draft arrives at *Baltimore* on the 7th April. The *Union Bank* finds it lodged for collection. No knowledge of the deed nor any fraud. Their duty was to send it forward. The trustees of *Poultney* come to the knowledge of this draft, and they give the notice in the record. No information of fraud is communicated to the bank. The notice is only a hypothetical statement. The *Union Bank* called for the deeds, and they had no reference to the transaction.

The misconduct of *Poultney, Ellicott & Co.* is not to be imputed to the *Union Bank;* the bank did not know that *Evan Poultney* was a creditor of that house, nor was the monstrous letter of *Poultney, Ellicott & Co.* known, which

showed *à priori* that they intended to fill their pockets.    The *Union Bank* knew not of these things, but was left to act and decide upon its naked rights.

By the Court :

JUDGMENT AFFIRMED.

HENRY STEVENSON, *et al vs.* EDWARD SCHRIVER AND WIFE.—*December, 1837.*

By the first section of the act of 1818, ch. 204, a party deeming himself aggrieved by the orders or decrees of the Orphans courts, may appeal to the court of Appeals, and the term "party," does not necessarily mean a litigant before the court, when the order or decree is passed, but any one on whose interests such order or decree has a direct tendency to operate injuriously.

An order of the Orphans court passing a claim of the executor, or administrator, against the estate, may be appealed from by a distributee or by a creditor, where the assets of the deceased are inadequate to the payment of debts.

The power of the Orphans courts in passing claims against the estate of the deceased, is not confined to strictly legal claims, but embraces every species of indebtedness, whether legal or equitable; nor is their authority in this respect limited to such as are proved according to the act of 1785, ch. 46.

They do not derive their power to pass open accounts from the 8th sec. of the 9th sub ch. of the act of 1798, ch. 101, nor are their powers on that subject imperatively restricted by it. The object of that section was to restrain the authority of executors and administrators in the payment of open accounts, not passed by the court, to such as were proved in the mode thereby prescribed.

The power of the Orphans courts in passing accounts before payment, is derived from the second section of the act of February session, 1777, ch. 8, and the first section of the 15th sub ch. of the testamentary system.

A testator bequeathed to his two grandaughters $9,000 each, with a direction that the said " legacy should be understood and deemed as given and bequeathed unto them, as their property respectively, and not either to their respective husbands or to their father," &c.

In a subsequent clause the testator said, " it is my will that if either of my said grandaughters should die under the age of 21 years unmarried, and without having any child or children, as aforesaid," then over to the survivor, &c.

Upon this will it was *held,* that upon the marriage of either of the legatees, the legacy vested absolutely in her, and that such portion of it as was re-